# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **TRADEBOT SYSTEMS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-632** |
| | ) | |
| **ANDREW O'HARA,** | ) | |
| **DANIEL KREJCI,** | ) | |
| **CLAYTON HARPER,** | ) | |
| **BRENDAN FORREST,** | ) | |
| **TYLER O'CONNOR,** | ) | |
| **BENJAMIN ANDELIN, and** | ) | |
| **MICHAEL MCATEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Tradebot Systems, Inc. ("Tradebot") hereby files this Verified Complaint for damages and equitable relief against Defendants Andrew O'Hara, Daniel Krejci, Clayton Harper, Brendan Forrest, Tyler O'Connor, Benjamin Andelin, and Michael McAtee.

## <u>Introduction</u>

Tradebot is a local company based in Kansas City, Missouri. It competes nationally in the extremely competitive high-frequency trading industry. High-frequency trading companies design platforms to trade significantly at various markets, such as the New York Stock Exchange, NASDAQ, etc. High-frequency trading platforms, such as Tradebot, use their complex intellectual property to analyze markets and place orders at exactly the right moment. In this competitive industry, time is literally of the essence, and trading platforms that move the fastest (as measured in nanoseconds) are generally the most successful. Tradebot's platform is built on its trade secrets and other confidential information such as its hardware, software, source code, designs, plans, and

other intellectual property. Tradebot protects its trade secrets and intellectual property by requiring its employees to sign Employment Agreements.

Here, Defendants are all former Tradebot employees who each signed an Employment Agreement with Tradebot and who each left Tradebot (either voluntarily or involuntarily). At first, a few of these former employees worked together for OF Technology, a small, start-up company that did not compete with Tradebot. These former employees originally were transparent with Tradebot and told Tradebot when they looked to hire other former Tradebot employees. Because OF Technology did not compete with Tradebot, Tradebot did not object. However, in the fall of 2018, OF Technology joined Jump Trading, LLC, a large high-frequency trading firm based in Chicago, Illinois. Around that time, a former Tradebot employee who worked for OF Technology reached out to Tradebot and asked if Tradebot was interested in being purchased by Jump. After Tradebot refused to engage in that discussion, the former employees stepped up their efforts to compete and even began secretly soliciting Tradebot's employees. Defendants are now unfairly competing against Tradebot by soliciting Tradebot employees to leave Tradebot and by working for a competitor in direct violation of their Employment Agreements.

## JURISDICTION AND VENUE

1.      Tradebot is, and was at all times material hereto, a Missouri corporation in good standing with a place of business in Kansas City, Missouri.

2.      Tradebot is, and was at all times material hereto, authorized to do business in the State of Missouri.

3.      Upon information and belief, Andrew O'Hara is an individual resident of Johnson County, Kansas, and may be served with process at 6417 W. 67th Street, Overland Park, Kansas 66202.

2

4.      Upon information and belief, Daniel Krejci is an individual resident of Johnson County, Kansas, and may be served with process at 9246 State Line Road, Leawood, Kansas 66206.

5.      Upon information and belief, Clayton Harper is an individual resident of Clay County, Missouri, and may be served with process at 4209 NE 84th Terrace, Kansas City, Missouri 64156.

6.      Upon information and belief, Brendan Forrest is an individual resident of Johnson County, Kansas, and may be served with process at 13744 W. 157th Terrace, Olathe, Kansas 66062.

7.      Upon information and belief, Tyler O'Connor is an individual resident of Jackson County, Missouri, and may be served with process at 250 W. 2nd Street, Apt. 4117, Kansas City, Missouri 64105.

8.      Upon information and belief, Benjamin Andelin is an individual resident of Clay County, Missouri, and may be served with process at 18301 Scott Road, Holt, Missouri 64048.

9.      Upon information and belief, Michael McAtee is an individual resident of Clay County, Missouri, and may be served with process at 3712 NE 95th Street, Kansas City, Missouri 64156.

10.      This Court has subject matter jurisdiction because Tradebot's claim under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*, ("DTSA"), pursuant to 28 U.S.C. § 1331 arises under the laws of the United States.  This Court has supplemental jurisdiction over Tradebot's other claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the DTSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

WA 13184672.4

11.     This Court has personal jurisdiction over each Defendant pursuant to RSMo § 506.500.1(1)-(3) because this action emerges out of each Defendant's breach of his respective Employment Agreement with Tradebot, which is governed by Missouri law, and under which each Defendant was employed to work in Missouri and by a Missouri company.

12.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the acts and omissions giving rise to the claim occurred within the Western District of Missouri, or, in the alternative if the Court determines that a substantial part of the acts or omissions giving rise to the claim did not occur within the Western District of Missouri, venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(3), because not all Defendants are residents of the State of Missouri but at least one Defendant is subject to the Court's personal jurisdiction with respect to this action.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

### Tradebot's Business

13.     Tradebot develops and uses proprietary automated trading software.

14.     Tradebot is a registered broker-dealer and a member of most major stock exchanges. Its high-frequency trading platform makes approximately a million trades each day.

15.     It does not have customers and does not give investment advice. Rather, it is competitive in the high-frequency trading industry due to the proprietary technology that runs its trading platform.

16.     In the high-frequency trading business, Tradebot differentiates itself through its trade secrets and other confidential information. Its trading systems must be extremely fast. The times at issue are measured in nanoseconds.

17.     Designing, developing, and implementing programs and platforms that support trading at these speeds is integral to Tradebot's success.

4

18.     Tradebot's trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc., separate it from its competitors in high-frequency trading.

19.     Tradebot's employees design, develop, and work closely with Tradebot's trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc.

20.     Tradebot invested considerable and significant resources, hundreds of millions of dollars, in fact, into the development of its trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc.

21.     If a competitor gained access to Tradebot's trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc., the competitor could use that information to speed up or otherwise improve its own processes and systems and therefore hinder the performance and profitability of Tradebot.

22.     Tradebot's trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc., derive independent economic value, actual or potential, from not being generally known and not readily ascertainable by competitors who would obtain significant economic value from their disclosure.

23.     Tradebot's trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc., are subject to reasonable efforts to maintain their secrecy.

WA 13184672.4

## Tradebot's Employment Agreements

24.     For example, Tradebot requires its employees to sign Employment Agreements as a condition of employment with Tradebot.

25.     Each Employment Agreement at issue in this lawsuit contains generally the same relevant language. For example, each Employment Agreement has a restrictive covenant that protects Tradebot's confidential information, trade secrets, and/or its intellectual property (a "Confidentiality Provision") (Paragraph 3.1(B) of the Agreements.)

26.     Each Employment Agreement also contains a restrictive covenant prohibiting employees, for a two-year period following the termination of their employment at Tradebot, from soliciting current or former Tradebot employees to leave employment at Tradebot (a "Non-Solicitation Provision"). (Paragraph 3.1(D) of the Agreements.)

27.     In addition, each Employment Agreement contains a restrictive covenant prohibiting employees, for a two-year period following the termination of their employment at Tradebot, from working for a company that competes against Tradebot (a "Non-Competition Provision"). (Paragraph 3.1(E) of the Agreements.)

28.     Each Employment Agreement also sets forth the relief available to Tradebot in the event of a threatened or actual breach of any of the restrictive covenants contained in the Employment Agreement. (Paragraph 3.2 of the Agreements.)

29.     These Employment Agreements serve several important functions, including protecting Tradebot's valuable and confidential information, trade secrets, and other proprietary information.

WA 13184672.4

Defendants' Employment with Tradebot

30.     Forrest was hired by Tradebot on or about November 7, 2005. As a condition of his employment, Forrest signed an Employment Agreement. A true and correct copy of Forrest's Employment Agreement is attached as **Exhibit A**.

31.     At the time he left Tradebot, Forrest was the Director of Software Development.

32.     As Director of Software Development, Forrest had oversight of the daily monitoring, maintenance, and improvement of the software that ran the core production trading system. He also worked with traders to test and implement new, or improve current, trading strategies. Forrest primarily utilitzed the C++ programming language.

33.     O'Hara was hired by Tradebot on or about November 14, 2005. As a condition of his employment, O'Hara signed an Employment Agreement. A true and correct copy of O'Hara's Employment Agreement is attached as **Exhibit B**.

34.     At the time he left Tradebot, O'Hara worked as a Vice President.

35.     As Vice President at Tradebot, O'Hara supervised a team of traders who utilized Tradebot's proprietary trading software to generate profit. He helped design trading strategies to capitalize on market opportunities and worked with Software Developers to incorporate those system improvements. O'Hara served on the Board of Tradebot from 2011-2013.

36.     In 2008, O'Hara and Tradebot's current CEO developed Tradebot's Canadian equities division, which traded Canadian equities until 2016.

37.     Krejci was hired by Tradebot on or about January 30, 2007. As a condition of his employment, Krejci signed an Employment Agreement. A true and correct copy of Krejci's Employment Agreement is attached as **Exhibit C**.

38.     At the time he left Tradebot, Krejci worked as a Vice President.

WA 13184672.4

39.     As Vice President at Tradebot, Krejci was the Supervisor of United States Equity Trading. This role included supervising a team who utilized Tradebot's proprietary trading software to generate profit. He helped design trading strategies to capitalize on market opportunities and worked with Software Developers to incorporate these system improvements.

40.     McAtee was hired by Tradebot on or about November 12, 2007. As a condition of his employment, McAtee signed an Employment Agreement. A true and correct copy of McAtee's Employment Agreement is attached as **Exhibit D**.

41.     At the time he left Tradebot, McAtee worked as a Senior Software Developer.

42.     As a Senior Software Developer at Tradebot, McAtee was essentially the sole individual responsible for all website development for the company, including internal, proprietary tools utilized to support certain frameworks around the core trading and risk management systems. McAtee primarily worked in the Python and Django programming languages.

43.     Andelin was hired by Tradebot on or about January 2, 2009. As a condition of his employment, Andelin signed an Employment Agreement. A true and correct copy of Andelin's Employment Agreement is attached as **Exhibit E**.

44.     At the time he left Tradebot, Andelin worked as a Senior Software Developer.

45.     As a Senior Software Developer at Tradebot, Andelin was a member of the software development team that monitored, maintained, and extended the core trading system. He also worked with traders to test and implement new trading strategies or to improve existing trading strategies. Andelin primarily worked in the C++ programming language.

46.     Harper was hired by Tradebot on or about June 1, 2009. As a condition of his employment, Harper signed an Employment Agreement. A true and correct copy of Harper's Employment Agreement is attached as **Exhibit F**.

WA 13184672.4

47.     At the time he left Tradebot, Harper worked as a Vice President.

48.     As a Vice President at Tradebot, Harper had oversight of the daily monitoring, maintenance, and improvement of the software that ran the core production trading system. He also worked with traders to test and implement new, or improve current, trading systems. Harper primarily utilized the C++ programming language.

49.     When Harper was hired, Forrest was Harper's supervisor.

50.     O'Connor was hired by Tradebot on or about May 27, 2014. As a condition of his employment, O'Connor signed an Employment Agreement. A true and correct copy of O'Connor's Employment Agreement is attached as **Exhibit G**.

51.     At the time he left Tradebot, O'Connor worked as a Software Developer.

52.     As a Software Developer at Tradebot, O'Connor built and maintained proprietary datasets that supported quantitative analysis, as well as key front/back end frameworks to support expansion of trading initiatives. O'Connor also worked with traders to research, identify, and implement new strategies, as well as improvements to existing trading strategies.

53.     During the course of their employment, all Defendants were highly compensated (annually receiving six-figures, and in some cases even seven-figures, in total compensation).

<u>Defendants' Post-Employment Actions</u>

54.     Forrest voluntarily resigned from Tradebot on or about March 7, 2014. Harper eventually took over as leader of the team that Forrest had left.

55.     On or about November 27, 2016, Forrest and O'Hara filed the Articles of Incorporation for OF Technology, LLC with the Kansas Secretary of State.

WA 13184672.4

56.     As a registered broker-dealer with the SEC, Tradebot requires its employees to disclose all outside business activities, but O'Hara did not inform Tradebot of the formation of OF Technology.

57.     O'Hara voluntarily resigned from Tradebot on or about December 19, 2016.

58.     At this time, he negotiated a significant, six-figure separation payment, but still never disclosed the fact that he had formed OF Technology or was partnering with a former Tradebot employee (Forrest).

59.     On January 12, 2017, O'Hara reached out to Tradebot's CEO and asked if Tradebot would be willing to share some of its data with him. Tradebot responded by stating that it would not share its trade secrets, including its source code, with O'Hara.

60.     On or about September 25, 2017, Tradebot terminated the employment of Krejci and O'Connor. At this time, Krejci supervised O'Connor.

61.     On or about September 28, 2017, O'Hara sent an email to Tradebot's Director of Human Resources. In this email, O'Hara acknowledged that Tradebot had enforceable Employment Agreements containing Non-Competition, Non-Solicitation, and Confidentiality provisions, but he asked for permission for OF Technology to hire former Tradebot employees. He explained that, since OF Technology was not involved in trading equities in the United States ("U.S. equities"), there would be no chance of competition. O'Hara told Tradebot that he wanted to be "transparent."

62.     Tradebot approved his request, but reminded O'Hara that its approval was only due to the fact that OF Technology was not trading U.S. equities. Tradebot also reminded O'Hara that the Confidentiality Provision in their Employment Agreements did not expire.

63.     Thereafter, OF Technology hired O'Connor and Krejci.

WA 13184672.4

64.     Since Tradebot's trading platform focuses on U.S. equities, OF Technology was not competitive with Tradebot and Tradebot understood that OF Technology would not be using Tradebot's confidential information, trade secrets, and/or proprietary information in developing its Canadian trading platform.

65.     Therefore, Tradebot decided not to enforce O'Hara, O'Connor, Krejci, and Forrest's Employment Agreements at that time.

66.     On or about May 25, 2018, Andelin voluntarily resigned from his employment at Tradebot. At this time, Andelin was a member of Harper's team.

67.     In September 2018, O'Hara informed Tradebot that OF Technology, which by now included former Tradebot employees O'Hara, Forrest, O'Connor, and Krejci, was moving to Jump Technology, LLC ("Jump"), a high-frequency trading firm based out of Chicago, Illinois.

68.     Jump's platform trades in U.S. equities and is competitive with Tradebot.

69.     O'Hara told Tradebot via email that he understood the Non-Competition Provisions and Confidentiality Provisions in "our employment agreements" with Tradebot, and that "we" will continue to abide by them.

70.     Upon information and belief, Forrest, O'Hara, Krejci, and O'Connor became employed by Jump on or about October 15, 2018.

71.     On or about October 31, 2018, Tradebot reached out to O'Hara via a text message to ask if Andelin was going to join their group at Jump. O'Hara confirmed that Andelin was coming to work with him.

72.     Via text message, O'Hara then suggested that Jump would be interested in purchasing Tradebot if Tradebot ever considered selling.

73.     Tradebot did not respond substantively to O'Hara's suggestion.

11

74.     Thereafter, O'Hara stopped keeping Tradebot informed about former Tradebot employees that were going to Jump.

75.     Andelin joined Jump on or about November 12, 2018.

76.     On or about March 11, 2019, McAtee told Tradebot's Director of Human Resources that O'Hara had approached McAtee about leaving Tradebot and coming to work for Jump.

77.     McAtee said he was considering the offer because O'Hara and the OF Technology team was now supported and backed by Jump, a company with significant resources.

78.     On or about March 12, 2019, Harper told Tradebot's CEO that he had an offer from Jump. Harper also told Tradebot's Director of Human Resources that part of his mandate at Jump would be to build a new team.

79.     McAtee and Harper voluntarily resigned from Tradebot on March 11 and 12, respectively, and their last date at work for Tradebot was March 22.

80.     Upon information and belief, on or about April 1, 2019, Harper and McAtee were hired by Jump.

81.     Upon information and belief, Harper thereafter solicited a former Tradebot employee who had been employed by Tradebot within the six-month period preceding Harper's resignation.

82.     Tradebot's former employees are no longer working for themselves in a small non-competing business; they now work for a direct competitor that trades in U.S. equities.

83.     Upon information and belief, the actions of O'Hara and Harper in soliciting and/or recruiting Tradebot employees who were either employed by Tradebot or were employed by Tradebot during the six-month period preceding their respective terminations are direct violations of their respective Employment Agreements.

WA 13184672.4

84.     Defendants' employment at Jump, a company that directly or indirectly competes with Tradebot in the United States, is a direct violation of their Employment Agreements.

85.     Defendants remain employed by Jump.

86.     Defendants have caused Tradebot damage, including without limitation, the loss or threatened loss of profits, business reputation, and market share. Tradebot has also incurred damages of attorneys' fees, expenses, and court costs.

87.     Defendants' conduct, in misappropriating Tradebot's trade secrets and other confidential information, in inducing Tradebot employees to breach their contracts, and in conspiring with one another to do the same, was and is willful, wanton, malicious, and outrageous, due to Defendants' evil motive and/or reckless indifference to the rights of Tradebot.

88.     Tradebot has been immediately and irreparably harmed and will continue to be immediately and irreparably harmed by Defendants' recruitment and solicitation of Tradebot's employees.

89.     Tradebot has been immediately and irreparably harmed and will continue to be immediately and irreparably harmed by Defendants' employment at Jump.

90.     Tradebot has been immediately and irreparably harmed and will continue to be immediately and irreparably harmed by Defendants using, divulging, revealing, reporting, publishing, transferring or disclosing, directly or indirectly, for any purpose Tradebot's trade secrets and other confidential information, including, but not limited to, its intellectual property such as its hardware, software, programs, source codes, etc.

91.     Tradebot has demanded that Defendants comply with their contractual obligations and provide details about their work with Jump. Defendants have refused to do so.

WA 13184672.4

## **COUNT I**
### **Violation of Defend Trade Secrets Act**
### **(Against all Defendants)**

92.    Tradebot re-alleges and incorporates the paragraphs above.

93.    The acts and conduct of Defendants constitute an actual and threatened misappropriation of Tradebot's trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*

94.    Tradebot derives independent economic value from its trade secrets not being generally known to, or reasonably ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and Tradebot's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

95.    Tradebot's trade secrets are related to activities and transactions used in, and/or intended for use in, interstate commerce, specifically engaging in high-frequency trading in U.S. equities markets.

96.    Upon information and belief, Defendants breached their duty to maintain the secrecy of Tradebot's trade secrets. Defendants have disclosed, used, and misappropriated, and/or threatened to disclose, use, and misappropriate Tradebot's trade secrets, and each Defendant knows that his knowledge of Tradebot's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

97.    Defendants' misappropriation of Tradebot's trade secrets was willful and malicious.

98.    Tradebot has incurred damages from Defendants' misappropriation and will be irreparably harmed by further misappropriation of its trade secrets in that Tradebot has no adequate remedy at law.

WA 13184672.4

99.     Defendants have been unjustly enriched as a result of their misappropriation of Tradebot's trade secrets.

100.     As the owner of the trade secrets, Tradebot has standing to bring a civil action under DTSA pursuant to 18. U.S.C. § 1836(b)(1).

101.     Under the provisions of the DTSA, Tradebot is entitled to a preliminary and permanent injunction and damages.

WHEREFORE, Tradebot respectfully prays for a judgment against Defendants and awarding Tradebot actual damages caused by Defendants' misappropriation and for their unjust enrichment, and for a preliminary injunction, and upon final trial, a permanent injunction enjoining Defendants from further use, disclosure, or misappropriation of Tradebot's trade secrets, for an award of costs and reasonable attorneys' fees, for an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii), and for such other relief as the Court deems just and appropriate.

## COUNT II
### Violation of Missouri's Trade Secrets Act
### (Against all Defendants)

102.     Tradebot re-alleges and incorporates the paragraphs above.

103.     The acts and conduct of Defendants constitute an actual and threatened misappropriation of Tradebot's trade secrets in violation of Missouri's Uniform Trade Secrets Act ("MUTSA"), RSMo § 417.540 *et seq.*

104.     Tradebot derives independent economic value from its trade secrets not being generally known to, or reasonably ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and Tradebot's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

105.     Upon information and belief, Defendants breached their duty to maintain the secrecy of Tradebot's trade secrets. Defendants have disclosed, used, and misappropriated, and/or

15

threatened to disclose, use, and misappropriate Tradebot's trade secrets, and each Defendant knows that his knowledge of Tradebot's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

106.     Defendants' misappropriation of Tradebot's trade secrets was willful and malicious.

107.     Tradebot has incurred damages from Defendants' misappropriation and will be irreparably harmed by further misappropriation of its trade secrets in that Tradebot has no adequate remedy at law.

108.     Defendants have been unjustly enriched as a result of their misappropriation of Tradebot's trade secrets.

109.     Under the provisions of the MUTSA, Tradebot is entitled to a preliminary and permanent injunction and damages.

WHEREFORE, Tradebot respectfully prays for a judgment against Defendants and awarding Tradebot actual damages caused by Defendants' misappropriation and for their unjust enrichment, and for a preliminary injunction, and upon final trial, a permanent injunction enjoining Defendants from further use, disclosure, or misappropriation of Tradebot's trade secrets, for an award of costs and reasonable attorneys' fees, for an award of punitive damages pursuant to RSMo § 417.457.2, and for such other relief as the Court deems just and appropriate.

## COUNT III
**Breach of Contract—Violation of Confidentiality Provisions**
**(Against all Defendants)**

110.     Tradebot re-alleges and incorporates here the paragraphs above.

111.     Defendants each entered into a valid and enforceable Employment Agreement with Tradebot.

16

112.     Upon information and belief, Defendants have each breached their Employment Agreement by disclosing the trade secrets and other confidential information of Tradebot to others for reasons other than to fulfill their duties to Tradebot, and by utilizing the trade secrets and other confidential information of Tradebot for their own benefit and that of others, including Jump, for reasons other than to fulfill their duties to Tradebot.

113.     The breach by Defendants of their respective Employment Agreements with Tradebot entitles Tradebot to equitable relief and monetary damages, the amount of which is unascertainable at this time and will be subject to proof at trial.

WHEREFORE, Tradebot respectfully prays for judgment against Defendants for preliminary, and upon final hearing, permanent injunctive relief enjoining Defendants from further breaches of their respective Employment Agreements, and for Tradebot's actual and compensatory damages in a sum sufficient to compensate it for the damage and harm it incurred in an amount to be proven at trial, and for such other and further relief as the Court deems just and proper.

**COUNT IV**
**Breach of Contract—Violation of Non-Compete Provisions**
**(Against O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee)**

114.     Tradebot re-alleges and incorporates here the paragraphs above.

115.     O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee each entered into a valid and enforceable Employment Agreement with Tradebot.

116.     O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee have each breached their Employment Agreement by working for Jump, a company that competes with Tradebot, within a two-year period following the termination of their employment with Tradebot.

117.     The breach by O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee of their respective Employment Agreements with Tradebot entitles Tradebot to equitable relief and

WA 13184672.4

monetary damages, the amount of which is unascertainable at this time and will be subject to proof at trial.

WHEREFORE, Tradebot respectfully prays for judgment against Defendants O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee for preliminary, and upon final hearing, permanent injunctive relief enjoining Defendants O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee from further breaches of their respective Employment Agreements, and for Tradebot's actual and compensatory damages in a sum sufficient to compensate it for the damage and harm it incurred in an amount to be proven at trial, for equitable extension of the period of Defendants' non-competition covenants under their Employment Agreements by a period of time equal to the amount of time in which those Defendants have been in breach of those covenants, and for such other and further relief as the Court deems just and proper.

### COUNT V
**Breach of Contract—Violation of Non-Solicitation Provisions**
**(Against O'Hara and Harper)**

118.    Tradebot re-alleges and incorporates the paragraphs above.

119.    Defendants O'Hara and Harper each entered into a valid and enforceable Employment Agreement with Tradebot.

120.    Upon information and belief, Defendants O'Hara and Harper each breached their Employment Agreement by, within a two-year period after the termination of their employment with Tradebot, directly or indirectly seeking to employ someone who was a Tradebot employee as of the date each Defendant's employment was terminated, or who was a Tradebot employee at any time within a six-month period preceding that termination, or otherwise soliciting, encouraging, causing or inducing any such Tradebot employee to terminate his employment with Tradebot.

WA 13184672.4

121.    Specifically, upon information and belief, Defendants O'Hara and Harper jointly or in concert, solicited, encouraged, caused, or induced Tradebot employees to terminate their employment with Tradebot and/or to sought to employ current and former Tradebot employees.

122.    The breach by O'Hara and Harper of their respective Employment Agreements with Tradebot entitles Tradebot to equitable relief and monetary damages, the amount of which is unascertainable at this time and will be subject to proof at trial.

WHEREFORE, Tradebot respectfully prays for judgment against Defendants O'Hara and Harper for preliminary, and upon final hearing, permanent injunctive relief enjoining Defendants O'Hara and Harper from further breaches of their respective Employment Agreements, and for Tradebot's actual and compensatory damages in a sum sufficient to compensate it for the damage and harm it incurred in an amount to be proven at trial, for equitable extension of the period of Defendants' non-solicitation covenants under their Employment Agreements by a period of time equal to the amount of time in which those Defendants have been in breach of those covenants, and for such other and further relief as the Court deems just and proper.

## COUNT VI
### Tortious Interference with Contracts
### (Against all Defendants)

123.    Tradebot re-alleges and incorporates the paragraphs above.

124.    Tradebot has a contract (an Employment Agreement) with all of its employees.

125.    Each Defendant has actual knowledge of the terms and conditions of the Employment Agreement that he entered into with Tradebot, and he has actual knowledge of the terms and conditions of the employment agreements that other Tradebot employees have signed.

126.    Upon information and belief, despite this knowledge, each Defendant, collectively and individually, intentionally interfered with Tradebot's Employment Agreements and induced or caused a breach of the Employment Agreement.

WA 13184672.4

127. Defendants' conduct was and continues to be done intentionally, improperly, and without justification.

128. As a direct result of each Defendant's tortious interference, Tradebot is entitled to equitable relief and monetary damages, the amount of which is unascertainable at this time and will be subject to proof at trial.

WHEREFORE, Tradebot respectfully prays for judgment against Defendants for Tradebot's actual and compensatory damages in a sum sufficient to compensate it for the damage and harm it incurred in an amount to be proven at trial, for an award of punitive damages, and for such other and further relief as the Court deems just and proper.

## COUNT VII
### Civil Conspiracy
### (Against all Defendants)

129. Tradebot re-alleges and incorporates the paragraphs above.

130. Upon information and belief, Defendants reached an agreement amongst themselves to commit intentionally the wrongful, tortious acts set forth herein.

131. Defendants, in furtherance of their agreement and mutual understanding, intentionally committed acts to breach their respective Employment Agreements, misappropriate trade secrets and other confidential information, and/or otherwise harm Tradebot, and they did so for their own benefit.

132. Each Defendant knew about and encouraged breaches of Tradebot's Employment Agreements.

133. As a result of Defendants' actions, Tradebot has been damaged.

WHEREFORE, Tradebot respectfully prays for a judgment against Defendants and awarding Tradebot its actual and compensatory damages caused by Defendants' civil conspiracy

WA 13184672.4

in an amount to be proven at trial, for punitive damages, and for other such relief as the Court deems just and appropriate.

## COUNT VIII
### Injunctive Relief
### (Against all Defendants)

134.    Tradebot re-alleges and incorporates the paragraphs above.

135.    The grant of an injunction is necessary to maintain the status quo of the parties pending final resolution of this case. The high-frequency trading business is very competitive, and as such, time is of the essence.

136.    Tradebot has no adequate legal remedy under the circumstances. The threatened injury to Tradebot outweighs any possible damage to Defendants, who were generously compensated in exchange for agreeing to the restrictive covenants in their respective Employment Agreements. Those restrictive covenants were reasonably necessary to protect Tradebot's substantial investments in developing its software, hardware, source code, and other intellectual property. Enforcement of the post-termination provisions in the Employment Agreements is the only manner to fairly and adequately protect Tradebot's interests.

137.    Tradebot will be immediately and irreparably harmed if relief is not granted because, in part, monetary damages are not sufficient. Tradebot has suffered, and will continue during the pendency of this lawsuit to suffer, damage to its good will and business expectancies if this Court does not restrain the Defendants from further violations of their respective Employment Agreements.

138.    The threatened and actual injury to Tradebot outweighs any possible damage to the Defendants, who have no right to engage, for a period of two years following the end of their employment with Tradebot, in a business that is competitive with Tradebot.

21

139. The threatened and actual injury to Tradebot outweighs any possible damage to Defendants, who have no right to solicit current or former Tradebot employees to do any of the actions which they are prohibited from doing in their respective Employment Agreements.

140. The threatened and actual injury to Tradebot outweighs any possible damage to Defendants, who have no right to disclose Tradebot's confidential information, trade secrets, and/or proprietary information.

141. Tradebot has a substantial likelihood of success on the merits of its case and the possibility of harm to Defendants if injunctive relief is granted is remote, whereas the irreparable injury to Tradebot in the absence of injunctive relief is severe. As such, the balance of harms weighs decidedly in Tradebot's favor.

142. The public interest, to the limited extent implicated, is served by upholding valid contracts, requiring Defendants to abide by their Employment Agreements with Tradebot, preventing individuals and entities from interfering with those Employment Agreements, and protecting intellectual property, including trade secrets.

143. The impact of issuing the requested injunction will not be adverse to the public interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Tradebot respectfully requests and prays that:

1. The Court enter a preliminary injunction and permanent injunction enjoining and restraining Defendants O'Hara, Krejci, O'Connor, Andelin, Harper, and McAtee, for a period of two (2) years beginning on the date of the Injunction, from:

        a) Continuing their employment at Jump, a competitor of Tradebot's; and

b) Directly or indirectly, whether as an employee, officer, director, independent contractor, consultant, stockholder, partner or otherwise, engaging in or assist others to engage in any enterprise or activity that competes, whether directly or indirectly, with Tradebot's business anywhere within the United States.

2. The Court enter a preliminary injunction and permanent injunction enjoining and restraining Defendants O'Hara, O'Connor, Krejci, Andelin, Harper, and McAtee for a period of two (2) years beginning on the date of the Injunction, from:

a) Directly or indirectly, on behalf of himself or on behalf of or in conjunction with any person, partnership, corporation or other entity, from (i) employing or seeking to employ any person who was at the date of each Defendant's termination of employment at Tradebot, or who was at any time within the six-month period preceding the Defendant's date of termination, an employee of Tradebot or any of its affiliates or otherwise solicit, encourage, cause or induce any employee of Tradebot or any of its affiliates to terminate their employment with Tradebot or such affiliate for employment with another company, or (ii) taking any action that would interfere with the relationship of Tradebot or its affiliates with their suppliers and franchisees, or engage in any other action or business that would have an adverse effect on Tradebot or its affiliates.

WA 13184672.4

3.     The Court enter a preliminary injunction and permanent injunction enjoining Defendants from using, divulging, revealing, reporting, publishing, transferring or disclosing, directly or indirectly, Tradebot's trade secrets, confidential information, and intellectual property.

4.     The Court equitably extend the period of Defendants' Non-Competition and Non-Solicitation covenants under their Employment Agreements by a period of time equal to the amount of time in which those Defendants have been in breach of those covenants.

5.     The Court award Tradebot of its actual damages from Defendants' violation of their Employment Agreements with Tradebot, in amounts to be determined at trial.

6.     The Court award Tradebot exemplary and/or punitive damages.

7.     The Court award to Tradebot its costs and attorneys' fees in this action.

6.     Such other relief as may be appropriate in this matter.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this matter.

DATED this day of August, 2019.

Respectfully submitted,

SPENCER FANE LLP

/s/ Douglas M. Weems
Douglas M. Weems       MO # 41165
Casey P. Murray        MO # 58741
Angus W. Dwyer         MO # 66443
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216
dweems@spencerfane.com
cmurray@spencerfane.com
adwyer@spencerfane.com
ATTORNEYS FOR PLAINTIFF

WA 13184672.4

## **VERIFICATION**

STATE OF Missouri )
                    ) ss.
COUNTY OF Clay )

    I, Jennifer Tomlinson, the CFO of Tradebot Systems, Inc., being duly sworn on my oath or having otherwise affirmed, state that the foregoing factual information in the Verified Petition is true and correct to the best of my knowledge, information, and belief at the present time.

_Jennifer Toml_

Jennifer Tomlinson

    Subscribed and sworn to before me, a notary public, this 9th day of August, 2019.

NOTARY PUBLIC
SEAL
STATE OF MISSOURI

JORDAN CHAMBERLIN
My Commission Expires
March 4, 2023
Platte County
Commission #15633693

_Jordan Chamberlin_

Notary Public

My Commission Expires: MaRCh 4, 2023